## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **DIONNE JOHNSON** | * | |
| **Plaintiff** | * | **CIVIL ACTION NO.** |
| | * | |
| **v.** | * | **SECTION " "** |
| | * | **JUDGE** |
| | * | |
| **MARLIN N. GUSMAN, ORLEANS** | * | **MAGISTRATE " "** |
| **PARISH SHERIFF; GARY MAYNARD,** | * | **JUDGE** |
| **OPSO COMPLIANCE DIRECTOR;** | * | |
| **CORRECT CARE SOLUTIONS, LLC;** | * | |
| **OPSO DEPUTIES JOHN/JANE DOES** | * | |
| **1-5 AND MEDICAL STAFF MEMBERS** | * | |
| **JOHN/JANE DOES 6-10** | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT

NOW INTO COURT, comes plaintiff, **DIONNE JOHNSON**, who files this matter as a result of the death of her son, Jamaine Johnson.

### JURISDICTION

1.

This action is filed, pursuant to 42 U.S.C. § 1983 in concert with the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §1988. Jurisdiction is premised on 28 U.S.C. §§1331, 1332 and 1343 and the statutory and constitutional provisions cited herein. Additionally, there is complete diversity between the parties and the amount in controversy exceeds $75,000.00. The plaintiff also invokes supplemental jurisdiction over the claims under state constitutional and statutory law, pursuant to 28 U.S.C. §1367.

PARTIES

PLAINTIFF

2.

**DIONNE JOHNSON**, plaintiff herein, is an adult citizen of the Parish of Orleans, State of Louisiana.  She is the mother of Jamaine Johnson, who never married and who died without children.

DEFENDANTS

3.

**MARLIN N. GUSMAN (hereinafter referred to as "SHERIFF"),** in his individual and official capacity as the Sheriff of Orleans Parish, is an adult citizen and domiciled in the Parish of Orleans, State of Louisiana.  At all times pertinent herein, he was the Sheriff of Orleans Parish and was responsible for the management, supervision, hiring, training, discipline and control of the deputies in his office and all medical personnel.  Additionally, Sheriff Gusman was responsible for the administration, policies, practices, customs and operations of the Sheriff's Office and its correctional facilities.

4.

**GARY MAYNARD (hereinafter referred to as "MAYNARD"),** in his individual and official capacity as Compliance Director of the Orleans Parish Sheriff's Office is an adult citizen of the United States and is domiciled in the Eastern District of Louisiana.  At all times relevant herein, he was the Compliance Director of the Orleans Justice Center (hereinafter referred to as "OJC").  Thus, he was responsible for the hiring, training, supervision, discipline and control of

the deputies and medical personnel under his supervision.  He was also responsible for the

administration, policies, practices, customs and operations of the OJC and its personnel.

5.

**CORRECT CARE SOLUTIONS, LLC (hereinafter referred to as "CCC")** was, at

all times relevant herein, the company that the Orleans Parish Sheriff's Office hired to provide

medical and mental health services to individuals incarcerated at the OJC.  Correct Care

Solutions, LLC was responsible for the staffing, training, policies and procedures for all medical

and mental health personnel at OJC.

6.

**OPSO DEPUTIES JOHN/JANE DOES 1-5 (hereinafter referred to as "DOE**

**DEPUTIES")**, in their individual and official capacities as deputies for the Orleans Parish Civil

Sheriff are adult citizens of the State of Louisiana, and upon information and belief, domiciled in

the Eastern District of Louisiana.  At times pertinent herein, they were employed by OPSO as

correctional officers assigned to the OJC and to monitor Johnson who was on suicide watch at

the time of his incarceration.

7.

**MEDICAL STAFF MEMBERS JOHN/JANE DOES 6-10 (hereinafter referred**

**to as "DOE MEDICAL STAFF MEMBERS")**, in their individual and official capacities as

employees of Correct Care Solutions, LLC are adult citizens of the State of Louisiana, and upon

information and belief, are domiciled in the Eastern District of Louisiana.   At all pertinent times

herein, these defendants were employed by Correct Care Solutions, LLC as medical

professionals hired to monitor Johnson who was on suicide watch at the time of his incarceration.

FACTUAL ALLEGATIONS

8.

Upon information and belief, Jamaine Johnson was arrested on or about September 21, 2017.

9.

Because of his previous diagnosis of depression and anxiety, Johnson was under suicide watch at the OJC.

10.

On or about May 12, 2017, four John/Jane Doe Deputies and some John/Jane Doe Medical Staff Members were on the tier where Johnson was housed.

11.

Two of the deputies were standing in front of Johnson's cell and were looking into his cell through a window as he attempted to hang himself with bedding; however, these deputies and the medical staff members did nothing to prevent Johnson's attempt to hang himself.

12.

Upon information and belief, this tier suffered from critical staffing shortages and lack of supervision. Employees and staff were routinely absent for long periods of time, often leaving inmates unsupervised. This failure to supervise created an environment that was indifferent to the critical needs of incarcerated parties like Mr. Johnson.

13.

All of the defendants were aware of the routine absence of personnel and the lack

of appropriate supervision; however, none of the defendants took sufficient steps to correct the severe deficiencies.

14.

Upon information and belief, the Sheriff maintained a video surveillance system covering the tier where Mr. Johnson was located.  The video surveillance system clearly shows the inaction of the defendants herein in supervising and monitoring Mr. Johnson.

15.

Because Mr. Johnson was housed in OJC since September 2016, the defendants were aware of his ongoing mental health difficulties, the need to monitor him and the possibility of referring him to a more adequate mental health facility.

16.

Upon information and belief, this tier had Doe Deputies and Doe Medical Staff Members who were inattentive, careless, improperly trained and improperly supervised. Because of this negligent behavior, these specific defendants were prone to ignore the procedures and protocols that applied commensurate with the level of risk of suicide and self-harm.  These conditions created a compromised environment for Mr. Johnson.

17.

Upon information and belief, one or more of the Doe Deputies were assigned to monitor Mr. Johnson's tier and the video surveillance system covering the tier.  These defendants were required to notify security staff whenever they detected a problem on the tier.  The Doe Deputies breached their duty to monitor the video surveillance system and

to alert the security staff of any problems with Mr. Johnson.  Failing to act on what the Doe Deputies did observe in front of Mr. Johnson's cell and on the video monitor confirms the liability of all of the defendants relative to their deliberate indifference to the safety of Mr. Johnson, including the necessity to have protection from self-harm.

18.

Upon information and belief, one or more of the Doe Medical Staff Members were assigned to monitor Mr. Johnson's tier and the video surveillance system covering the tier. These defendants were required to notify security staff whenever they detected a problem on the tier.  The Doe Medical Staff Members breached their duty to monitor the video surveillance system and to alert the security staff of any problems with Mr. Johnson.  Failing to act on what the Doe Deputies did observe on the video monitor confirms the liability of all of the defendants relative to their deliberate indifference to the safety of Mr. Johnson, including the necessity to have protection from self-harm.

19.

On May 11, 2017, Mr. Johnson attempted suicide at the OJC.  He later died on May 20, 2017.

20.

The custom and practice of inefficient monitoring and protection have been, unfortunately, a staple at the OJC.  The execution by the Sheriff, Maynard and CCC of the policies regarding the protection of mentally ill people who are incarcerated has been lacking for several years.  First, there has been inadequate staffing and poor monitoring of tiers which essentially create unconstitutional risks to individuals housed at OJC.  Further, the defendants

6

failed to develop and to execute a suicide prevention procedure that outlined the conditions of the monitoring by the defendants and incorporated a requirement of an individualized clinical determination of allowable clothing, property and utensils.  Finally, the defendants failed to ensure that the tier designated by OJC for housing suicidal individuals were retrofitted to render them suicide-resistant (i.e. eliminating bed frames/holes, sprinkler heads, water faucet lips and unshielded lighting or electrical sockets).

21.

The defendants, in particular, the Sheriff, Maynard and CCS had constructive and actual notice or should have had had constructive or actual notice about the unconstitutional patterns and practices.  There are a number of examples of incarcerated individuals being subjected to unconstitutional risks of harm resulting in serious injuries or even death that have occurred under the care, custody and control of the defendants.

22.

Further, the defendants, in particular, the Sheriff, Maynard and CCS had constructive and actual notice or should have had constructive or actual notice regarding the serious deficiencies in the policies, practices and procedures at the jail related to medical and psychiatric screening, care and observation of incarcerated individuals generally and those suffering from mental illness specifically.  These defendants were also aware of the inadequate staffing, training and supervision of medical and correctional staff with regard to medical and psychiatric problems of these individuals.  Yet, staring at these chronic problems, the defendants failed to make necessary changes to policies, procedures, training, supervision or staffing to correct the

problems and to provide Mr. Johnson and others similarly situated adequate security supervision and treatment for serious mental health needs.

23.

The defendants were aware of the history of the office's deliberate indifference and failure to properly monitor individuals with mental health needs, including but not limited to, the following incidents:

1. In March 1995, a Judgment was entered in favor of William DeMouy and against the Sheriff (USDC No. 94-423) for improper monitoring and inadequate care of a suicidal prisoner place in five (5) point restraints on the psychiatric floor of the OPCSO.

2. In November 1996, Reggie Hargrove was being monitored for suicide, when he hanged himself with a bed sheet in a cell which was out of the line of vision of the nurses and deputies' stations and which had numerous "anchor" and "tie-off" points.

3. In April 2004, Matthew Bonnette, professed suicidal thoughts.  He was later placed in four (4) point restraints and was on suicide watch.  While in four (4) point restraints, he hanged himself in HOD-10 using the five (5) point restraint belt which had been left in his cell, after deputies failed to consistently monitor him.

4. In August 2007, Julio Sortes hanged himself with a telephone cord in his cell.  The Sheriff did not have any evidence that he was referred for a psychiatric assessment or treated for his illness.

5. In October 2008, Louis Prince was being held on HOD-10.  Despite reports of escalating erratic behavior, Prince was not placed on suicide watch.  He hanged himself in his cell in October 2008.

6. In July 2010 Jose Nelson Reyes Zelaya committed suicide at OPP.

7. In June 2011, an immigration detainee, whose name is unknown at this time, committed suicide at the jail.

8. In October 2016, Jaquin Thomas, 15 years old, hanged himself in his cell.

9. In March 2016, Cleveland Tumblin hanged himself in a shower stall.

10. In February 2017, Colby Crawford had been diagnosed with multiple mental illnesses. As a punishment for minor infractions, he was moved from the psychiatric ward to the general population.  He was later found dead, as a result of a cocaine overdose.

24.

In many of these incidents, few of these defendants and/or other OJC and CCS staff were reprimanded, appropriately disciplined or held accountable for their acts of commission and omission.  The superiors of these individuals, who were responsible for training, monitoring and managing these individuals, were also not subjected to appropriate discipline in failing their management, supervisory and training responsibilities.

25.

There is further historical and operational context for the negligent and unconstitutional acts of the defendants.  On October 10, 2008, the National Institute of Corrections issued a report to Sheriff Gusman entitled *"An Operational Review of the Orleans Parish Jail."*  The report noted distinct and disturbing problems at the jail in regard to inadequate staff, poorly trained personnel and a mental health program too narrow and restricted in its scope.  The report concluded that the jail lacked appropriate therapeutic services for mentally ill prisoners.

26.

Later, the United States Department of Justice, Civil Rights Division, issued a "findings letter" addressed to Sheriff Gusman regarding the Orleans Parish Prison system. The Department of Justice found that the OPP failed to provide incarcerated individuals constitutionally accepted standards of adequate mental health care, as it contained significant deficiencies related to inadequate suicide prevention; inadequate intake and referral process;

9

inadequate staffing; inadequate assessment and treatment and inadequate quality assurance review.  Additionally, the findings letter noted that the OPP failed to employ sufficient mental health staff to treat incarcerated individuals with adequate mental health services. It found that the OPP failed to timely assess and treat individuals with mental illness and neglected to analyze past mental information to provide adequate treatment.  The DOJ concluded that the failures of the OPP essentially resulted in mental health deterioration and unnecessary suffering.

27.

Armed with this information regarding both agencies' findings, the Sheriff failed to take adequate and sufficient steps to address these issues.

28.

Later, on April 23, 2012, the Department of Justice issued a second findings letter, based on an investigation of the OPP.  The DOJ found the Orleans Parish Prison was deliberately indifferent to individuals incarcerated with serious medical and mental health needs.  It noted that the OPP had inadequate mechanisms to identify individuals with mental illness and an inadequate treatment staff to address urgent and chronic conditions. The letter also stated that the OPP's understaffing resulted in situations of incarcerated individuals being left unsupervised for long periods of time.  It pointed out a direct correlation between the lack of supervision and the unconstitutionally high risk of harm at OPP.

30.

In 2012, the class action of *Jones, et al v. Gusman, et al, U.S.D.C. (Eastern District of Louisiana) No. 12-859* was filed asserting the unconstitutional conditions at OPSO facilities and contained multiple reports by security experts and mental health experts. After a three day fairness hearing, a Consent Judgment was entered that cited numerous findings and requirements regarding staff levels and mental healthcare at Orleans Parish Prison. The principal purpose of the lawsuit and the subsequent Consent Order was to align the practices and facilities under the Sheriff's guidance with the United States Constitution.

31.

The Consent Order covered various areas under the control of the Sheriff, including the management and delivery of mental health services to incarcerated individuals. It cited a number of shocking deficiencies in the OPP's medical and mental health care system. The Consent Order concluded that the evidence presented showed that a lack of treatment altogether, rather than inadequate treatment, contributed to severe deficiencies in medical and mental health care delivery to incarcerated individuals. The Consent Order specifically stated that the consent judgment provisions on mental and medical health care were necessary to remedy the violation of constitutional rights.

32.

Moreover, the Consent Order made findings related to the dramatically insufficient staffing of mental and medical health care providers. The mental health staffing was quite inadequate, and the security staff at OPP was patently inadequate. The inadequate level of security staff was directly related to the increased risks of harm to incarcerated

individuals because it resulted in various tiers being unsupervised for long periods of time.

33.

The Sheriff, Maynard and CCS had constructive and actual notice or should have had constructive and actual notice of these deplorable conditions, including insufficient staffing and mental healthcare, as outlined in the reports, letters and litigation referenced herein.  These defendants have failed to take the proper steps and make changes in policies, procedures, staffing, training and/or facilities to protect inmates from harm, including providing adequate care to mentally ill individuals.  These defendants have also failed to ensure that appropriate supervision and disciplinary action was taken in situations where incarcerated individuals suffered or died, as a result of inadequate and inappropriate care or treatment by the Sheriff's staff and contractors.

34.

The Sheriff, Maynard and CCS had constructive and actual notice or should have had constructive and actual notice that the standard of care for mentally ill individuals could not be addressed by the policies, procedures and staffing of the Sheriff and CCS but failed to take appropriate steps to see that Jamaine Johnson and others similarly situated received adequate care consistent with community standards of care.

35.

Equally important, armed with the knowledge of these deplorable conditions, the Sheriff, Maynard and CCS ratified or condoned acts of commission and omission by the Sheriff's staff which, in many instances, caused serious harm, suffering and death to individuals housed at the OJC and cultivated customs and practices whereby there was no accountability for OPP staff

who mistreated prisoners or who violated policies, procedures or standards of care for incarcerated individuals. The defendants' actions were the proximate and direct cause that resulted in the death of Jamaine Johnson on May 20, 2017.

36.

The Sheriff and Maynard were ultimately responsible for hiring, training, supervising, disciplining, and managing all employees of the Sheriff's Office. They are responsible for implementing and enforcing all policies and procedures at the OJC. They are also responsible for each defendant named herein.

37.

CCS is ultimately responsible for hiring, training, supervising, disciplining and managing the medical defendants named herein. Further, they are responsible for implementing and enforcing all policies and procedures of the medical personnel at the Sheriff's Office and at the OJC. CCS was responsible for the overview, review, monitoring, supervision and evaluation of Jamaine Johnson's mental health and medical needs, the delivery of care for him and the procedures governing his treatment. CCS violated Mr. Johnson's constitutional rights by ignoring his serious medical needs and exercising deliberate indifference that resulted in his death.

38.

John/Jane Does #1-5 or the Doe Deputies are each persons who had the responsibility and duty to monitor and to intervene while monitoring Mr. Johnson's conduct via a video surveillance system. They responded to his serious medical needs with deliberate indifference and negligence.

39.

John/Jane Does #6-10 or the Doe Medical Staff Members are each persons who had the responsibility to provide adequate and appropriate psychiatric care to Mr. Johnson. They had a duty to document in writing the steps necessary to be taken and the steps taken for the continuity of care for Mr. Johnson, including evaluation and monitoring of the medical and psychiatric condition, health and safety of Mr. Johnson and providing appropriate and adequate psychiatric care and assessments for him with proper documentation. They failed in their duties to Mr. Johnson, and their actions demonstrated deliberate indifference to Mr. Johnson's serious medical needs. Their care of Mr. Johnson was negligent and below the standard of care for mental health professionals.

40.

The Sheriff, Maynard and CCS knew that the policies, practices and procedures regarding security staffing and mental healthcare at OPSO were substandard and constituted a clear danger of serious bodily harm to detainees at OJC. Nevertheless, they failed to correct these policies, practices and procedures. Their inaction and deafening silence condoned and ratified these practices. Their inaction and deafening silence represented deliberate indifference and/or negligence to Mr. Johnson.

41.

The defendants knew or should have known the mental health condition of Jamaine Johnson. All of the defendants failed to take the necessary measures to protect and preserve Jamaine Johnson's life. All of the defendants' actions were taken with deliberate indifference to Mr. Johnson's risk of serious bodily harm and failed to meet the applicable standard of care.

**FIRST CAUSE OF ACTION**

42.

Plaintiff repeats and re-alleges each and every allegation of this Complaint.

43.

The defendants, acting individually and together under color of law, engaged in a course of conduct and conspired to engage in a course of conduct that deprived Jamaine Johnson of his constitutional rights, specifically, the right to be in a reasonably safe and secure place of detention, reasonable and adequate medical care, the right to be free from cruel and unusual punishment and the right to due process and equal protection of the laws as protected by the Fourteenth Amendment and Article IV (Privileges and Immunities Clause) of the United States Constitution and 42 U.S.C. §1983.

44.

At all times relevant herein, the defendants, acting individually and collectively, acted unreasonably, recklessly and with deliberate indifference and disregard for the constitutional and civil rights and life and serious medical needs of the deceased, Jamaine Johnson.

45.

The defendants' actions were reckless, willful, wanton and malicious.

46.

The defendants had the duty and ability to intervene to prevent the violations of Jamaine Johnson's civil rights but failed to do so.

47.

Plaintiff further alleges that such acts as alleged herein were the proximate cause

and direct cause of the injuries sustained and the death of Jamaine Johnson.

## SECOND CAUSE OF ACTION

48.

Plaintiff repeats and re-alleges each and every allegation of the Complaint.

49.

The Sheriff, Maynard and CCS, acting individually and collectively, established,

condoned and ratified customs, patterns, policies and practices that directly and proximately

caused the deprivation of the civil rights and constitutional rights of Mr. Johnson and the

damages and injuries described herein, in violation of the Fourteenth Amendment to the

United States Constitution and 42 U.S.C. §1983.  They did so with deliberate indifference

to the rights of detainees at OPSO facilities.  The policies, patterns and practices include,

but are not limited to, the following:

1. Failing to develop and maintain comprehensive policies and procedures for appropriate screening and assessment of incarcerated individuals with mental illness;

2. Failing to develop and implement an appropriate screening instrument that identified mental health needs and ensured timely access to a mental health professional when presenting symptoms requiring such care;

3. Failing to develop and implement protocols, commensurate with the level of risk of suicide or self-harm to ensure that detainees are protected from identified risks for suicide or self-injurious behavior;

4. Failing to ensure that a Qualified Mental Health Professional montiors and assesses detainees with mental health issues in a comprehensive manner, including maintaining a risk profile for each detainee on the mental health case load;

5. Failing to ensure that mental health treatment plans were in place to adequately treat a detainee's acute mental health needs;

6. Failing to ensure that all staff and contractors who supervise detainees have the adequate knowledge, skill and ability to address the needs of detainees at risk for suicide;

7. Failing to properly staff and to monitor tiers where detainees are housed;

8. Failing to hire experienced and capable persons to screen and to monitor persons in the custody of the OPSO;

9. Failing to hire adequately trained persons to render medical and psychiatric treatments to persons incarcerated;

10. Failing to adequately hire, train, supervise and discipline deputies and supervisors responsible for the observation and monitoring of detainees and the identification and communication of problems and/or serious medical needs of persons in custody to appropriate medical personnel;

11. Maintaining a pattern and practice of ignoring detainees' requests and needs for medical and/or psychiatric treatment, including the need for proper medications and/or providing insufficient treatment for various conditions;

12. Failing to develop and implement policies and procedures for suicide precautions that outline the conditions of the watch and incorporating a requirement of an individualized clinical determination of allowable clothing, property and utensils;

13. Failing to ensure that cells designated by OPSO for housing suicidal detainees are retrofitted to render them suicide-resistant;

14. Failing to maintain quality control policies, procedures and practices; critical incident reviews and mortality reviews.

50.

At all times relevant herein, the defendants acted unreasonably and with deliberate

indifference and disregard for the constitutional and civil rights of Jamaine Johnson.  The actions

of the defendants were malicious, willful, wanton and reckless.  The defendants' acts of

commission and omission were the proximate cause and direct cause of the death of Jamaine

Johnson, the injuries suffered by the plaintiff and the damages incurred.

## THIRD CAUSE OF ACTION

### 51.

Jamaine Johnson had a disability under Section 504 of the Rehabilitation Act and the

Americans with Disabilities Act (ADA).  He suffered from mental illness, namely, depression

and anxiety.

### 52.

The Sheriff operates the Orleans Justice Center which is a public entity that must comply

with Section 504 and the Americans with Disabilities Act.

### 53.

Plaintiff is entitled to relief against the Sheriff, in his official capacity, as the OPSO had

constructive and actual notice of Mr. Johnson's disability, had means to accommodate his

disability and failed to make that reasonable accommodation.

### 54.

Instead of accommodating Mr. Johnson's disability, the Sheriff denied Mr. Johnson

services and programs available to others, including but not limited to, access to appropriate

supervision and mental health treatment that could have prevented or reduced the risk of his

death.  The failure to accommodate was a proximate cause of Mr. Johnson's death.

## FOURTH CAUSE OF ACTION

### 55.

Plaintiff repeats and re-alleges each and every allegation of the Complaint.

18

56.

The supplemental jurisdiction of this Honorable Court is invoked for all claims under state law.

57.

The defendants acted negligently and with gross negligence in intentionally denying reasonable and necessary medical care to Jamaine Johnson; failing to properly monitor him and confining him in unsafe and unreasonable conditions, increasing the chances of him harming himself and inflicting physical injury and severe emotional, mental and physical pain and suffering upon him in violation of Louisiana law.

58.

The actions of commission and omission by the defendants caused the wrongful death of Jamaine Johnson.

59.

All of the defendants are liable for the actions as alleged herein that were the direct and proximate cause of the injuries sustained herein.

## DAMAGES

60.

As a result of the negligence of the defendants, Jamaine Johnson developed and suffered severe and fatal physical maladies and conditions and on account of the same, he would have been entitled to recover damages, had he not died.  Pursuant to Louisiana Civil Code Article 2315.1, Dionne Johnson is entitled to recover and hereby requests the damages that Jamaine Johnson would have been entitled to recover, had he not died on May 20, 2017.

19

61.

In addition, the negligence of all of the defendants deprived the plaintiff of the love, society, companionship, services, income and the net present value of the life expectancy of Jamaine Johnson.  Pursuant to Louisiana Civil Code Article 2315.2, the plaintiff is entitled to recover damages from the defendants.  As a result of Jamaine Johnson's death, the plaintiff has sustained damages and losses, including but not limited to, hedonic damages for which the plaintiff hereby requests damages from the defendants.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, Dionne Johnson, prays that after due proceedings commence, judgment is rendered in her favor and against all defendants, individually and jointly, as follows:

1. Compensatory and punitive damages as prayed for herein;

2. Reasonable attorney's fees, as provided in 42 U.S.C. §1988 and 42 U.S.C. §12205 and all costs of these proceedings and legal interest.

3. All other relief that is proper under this Honorable Court's jurisdiction.

Respectfully submitted,

s/Randy G. McKee
Randy G. McKee, Esq. (#24552)
Carter & McKee, L.L.C.
1100 Poydras Street
Suite 1475
New Orleans, LA  70163
Telephone:     504.581.5902
Facsimile:      877.644.2116
Email:          rmckee@cartermckeelawfirm.com
**COUNSEL FOR DIONNE JOHNSON**